[S.F. No. 24062. Apr. 10, 1980.]

JAMES FORSHER, Plaintiff and Appellant, v.
VINCENT BUGLIOSI et al., Defendants and Respondents.

**COUNSEL**

Scott Noble and Belzer, Jackl & Lane for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Walter R. Allan and Jerome C. Dougherty for Defendants and Respondents.

**OPINION**

**MANUEL, J.**—Plaintiff James Forsher appeals from the judgment of dismissal entered pursuant to an order sustaining a general demurrer without leave to amend to his first amended complaint for libel and invasion of privacy. We affirm.

The defendant, Vincent Bugliosi (Bugliosi), was at one time a deputy district attorney, and in this capacity prosecuted and obtained a conviction against Charles Manson and certain of his coterie for the highly

publicized crimes collectively referred to as the Tate-LaBianca killings.[1] Bugliosi has been recognized by the public as being an authority on these killings and on the members and activities of that loose-knit group of persons known as the Manson Family.

Bugliosi and the other defendants are variously the authors and publishers of the book Helter-Skelter, which purports to be an inside account of the Tate-LaBianca killings, the subsequent murder trial and of the criminal activities of the Manson Family.

The edition of the book complained of is more than 650 pages long. Its cover proclaims its nature as an inside account of the "whole story —including the never-before-revealed 'retaliation' slayings—of the most baffling mass murder case in the annals of American crime...." At the outset the book sets forth a "cast of characters." Included is Ronald Hughes (Hughes), described as being "once Charles Manson's 'hippie lawyer,' he later defended Leslie Van Houten [member of Manson family on trial in the Tate-LaBianca matter], up until the time he was murdered by the Family." The killing of Hughes is described as being one of the first of the retaliation murders.

The book further raises questions about the proficiency of the various police agencies involved in the investigation activities of the Manson clan, the failure to pursue leads and the destruction and overlooking of evidence being noted continually throughout the book.[2] The book recounts events in great detail leading up to the prosecution of Manson and others. It was in the course of this trial that Hughes, while representing Leslie Van Houten, failed to appear at trial.[3] Specifically, plaintiff refers us to the following account:

"When court resumed on Monday, November 30, Ronald Hughes was absent.

---

[1] Since the judgment was entered upon the sustaining of the general demurrer, the factual allegations of the complaint will be deemed true for the purposes of this appeal. The book is incorporated by reference into the complaint.

[2] For example, police officers originally accepted the theory that family member "Zero" had fatally shot himself while playing "Russian Roulette" simply because the same story relating to the event was told by three other members of the family and despite the fact that the gun which supposedly was used contained no fingerprints and contained seven live rounds and one spent shell, indicating that when fired it was fully loaded.

[3] The book uses pseudonyms and symbols to refer to persons who were tangentially involved or who were members of law enforcement agencies whose competence was questioned.

"Quizzed by [Judge] Older, none of the other defense attorneys knew where he was. Fitzgerald said that he had last talked to Ron on Thursday or Friday, and that he sounded O.K. at that time. Hughes often spent his weekends camping at Sespe Hot Springs. . . . It was possible that Hughes had been stranded there.

"The next day we learned that Hughes had gone to Sespe on Friday with two teenagers, James Forsher and Lauren Elder, in Miss Elder's Volkswagen. The pair—who were questioned but not held—said that when it began raining, they had decided to return to L.A., but Hughes had decided to stay over until Sunday. When the two tried to leave, however, their auto became mired down, and they were forced to abandon it and hike out.

"Three other youths had seen Hughes on the morning of the following day, Saturday the twenty-eighth. He was alone . . . , well away from the flood area. Chatting with them briefly, he appeared neither ill nor in any danger. Polygraphed, the three were found to have no additional knowledge and they were not held. Since Forsher and Elder had last seen Hughes a day earlier, they apparently were not polygraphed and their story was taken at face value.

"Owing to the continued bad weather, it was two days before the Ventura Sheriff's Office could get up a helicopter to search the area. In the meantime, rumors abounded. One was to the effect that Hughes had deliberately skipped, either to avoid argument or to sabotage the trial. Knowing Ron, I seriously doubted if this was true. I became convinced it wasn't when reporters visited the place where Hughes lived.

"He slept on a mattress in a garage behind the home of a friend. According to reporters, the place was a mess—one remarked that he wouldn't even let his dog sleep there. But on the wall of the garage, neatly framed and carefully hung, was Ronald Hughes' bar certificate.

"Although there were numerous reports that a man fitting Hughes' description had been seen in various places—boarding a bus in Reno, driving on the San Bernardino freeway, drinking at a bar in Baja—none checked out. On December 2, Judge Older told Leslie Van Houten that he felt a co-counsel should be brought in to represent her during Hughes' absence. Leslie said she would refuse any other attorney.

"On December 3, after consulting with Paul Fitzgerald, Older appointed Maxwell Keith co-counsel for Leslie.

"A quiet, somewhat shy man in his mid-forties, whose conservative clothing and courtroom manner were in sharp contrast to those of Hughes, Keith had an excellent reputation in the legal community. Those who knew him well described him as conscientious, totally ethical, and completely professional, and it was clear from the start that he would be representing his client and not Manson.

"Sensing this, Manson asked to have all the defense attorneys dismissed ('they aren't our lawyers; they won't listen to us') so he and the girls could represent themselves. He also demanded that the case be reopened so they could put on a defense. They had twenty-one witnesses waiting to testify, he said. Both requests were denied.

"       .       .       .       .       .       .       .       .       .       .       .       .       "       .       .       .

"Neither the air search nor a subsequent ground search of the Sespe area yielded any trace of Hughes. The abandoned Volkswagen was found, with a batch of court transcripts inside, but other papers Hughes was known to have had, including a secret psychiatric report on Leslie Van Houten, were missing.

"       .       .       .       .       .       .       .       .       .       .       .       "       .       .       .

"The most persistent rumor was that Hughes had been murdered by the Family. There was, at this time, no evidence of this. But there was more than ample cause for speculation.

"Though once little more than an errand boy for Manson, during the course of the trial Hughes had grown increasingly independent, until the two had finally split over whether there should be a defense —Hughes strongly opposing his client's taking the stand to absolve Charlie. I also heard from several sources, including Paul Fitzgerald, that Hughes was afraid of Manson. It was possible that he showed this fear, which in Manson's case, was like waving a red flag before a bull. Fear turned Charlie on.

"There could have been several reasons for his murder, if it was that. It may have been done to intimidate the other defense attorneys into letting Manson put on a defense during the penalty trial (one was

so shaken by Hughes' disappearance that he went on a bender which ended in his arrest for drunken driving). Equally likely, it could have been a tactic to delay the trial—with the hope that it would result in a mistrial, or set the stage for a reversal on appeal.

"Speculation, nothing more. Except for one odd, perhaps unrelated, incident. On December 2, four days after Hughes was last seen alive, fugitives Bruce Davis and Nancy Pitman, aka Brenda McCann, voluntarily surrendered to the police. Two of the Family's most hard-core members, Pitman had been missing for several weeks after failing to appear for sentencing on a forgery charge, while Davis—who had been involved in both the Hinman and Shea murders, who had picked up the gun with which Zero had 'committed suicide' but had somehow left no prints, and who was the chief suspect in the slaying of two young Scientology students—had evaded capture for over seven months.

"Maybe it was just the proximity in time that linked the two events in my mind: Hughes' disappearance; Davis' and Pitman's surprise surrender. But I couldn't shake the feeling that in some way the two incidents might be related."

Approximately 110 pages later, plaintiff's name again appears as part of the following:

"With three exceptions, these are all the known murders which have been proven, or are suspected to be, linked to the Manson Family. Are there more? I've discussed this with officers from LAPD and LASO, and we tend to think that there probably are, because these people liked to kill. But there is no hard evidence.

"As for those three other murders, two of them occurred as late as 1972.

"On November 8, 1972, a hiker near the Russian River resort community of Guerneville, in Northern California, saw a hand protruding from the ground. When police exhumed the body, it was found to be that of a young man wearing the dark-blue tunic of a Marine dress uniform. He had been shotgunned and decapitated.

"The victim was subsequently identified as James T. Willett, twenty-six, a former Marine from Los Angeles County. This information appeared on radio and TV newscasts on Friday, November 10.

"On Saturday, November 11, Stockton, California, police spotted Willett's station wagon parked in front of a house at 720 West Flora Street. When refused entry to the house, they broke in, arresting two men and two women and confiscating a number of pistols and shotguns.

"Both women had Manson Family X's on their foreheads. They were Priscilla Cooper, twenty-one, and Nancy Pitman, aka Brenda McCann, twenty. A few minutes after police entered the residence, a third female called, asking to be picked up and given a ride to the house. The police obliged, and also arrested Lynette Fromme, aka Squeaky, twenty-four, ex-officio leader of the Family in Manson's absence.

"The two men were Michael Monfort, twenty-four, and James Craig, thirty-three, both state prison escapees wanted for a number of armed robberies in various parts of California. Both had the letters 'AB' tattooed on their left breasts. According to a spokesman for the state Department of Corrections, the initials stood for the Aryan Brotherhood, described as 'a cult of white prison inmates, dedicated largely to racism but also involved in hoodlum activities, including murder contracts....'

"While in the house, the police noticed freshly turned earth in the basement. After obtaining a search warrant, they began digging, and early the following morning exhumed the body of Lauren Willett, nineteen. She had been shot once in the head, her death occurring either late Friday night or early Saturday morning, not long after the identity of her slain husband was revealed on the news broadcasts.

"Questioned by the police, Priscilla Cooper claimed that Lauren Willett had killed herself 'playing Russian roulette.'

"Although, like Zero, Mrs. Willett was not able to contradict this story, the Stockton police were far more skeptical than had been LASO. The three women and two men were charged with her murder.

"They were scheduled to go on trial in May 1973. On April 2, however, four of the five surprised the Court by entering guilty pleas. Michael Monfort, who pleaded guilty to the murder of Lauren Willett, was sentenced to seven years to life in state prison. Superior Court Judge James Darrah also ordered consecutive terms of up to five years and two years for James Craig, who had pleaded guilty to being an accessory after the fact to murder and to possessing an illegal weapon,

i.e., a sawed-off shotgun. Both girls also pleaded guilty to being an accessory after the fact, and both Priscilla Cooper and Nancy Pitman, aka Brenda, who Manson once indicated to me was his chief candidate for Family assassin, were sent to state prison for up to five years.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Monfort, and an accomplice, William Goucher, twenty-three, subsequently pleaded guilty to second degree murder in the death of James Willett, and were sent to state prison for five years to life. Craig, who pleaded guilty to being an accessory after the fact to the murder, was given another prison term of up to five years.

"The motive for the two murders is not known. It is known that the Willetts had been associated with the Manson Family for at least a year, and possibly longer. Police surmised that Lauren Willett was killed after learning of the murder of her husband, to keep her from going to the police. As for the murder of James Willett, the official police theory is that Willett himself may have been about to inform about the robberies the group had committed.

"There is another possibility. It may be that both James and Lauren Willett were killed because they knew too much about still another murder.

"James and Lauren. Something about those first names seemed familiar. Then it connected. On November 27, 1970, a James Forsher and a Lauren Elder drove defense attorney Ronald Hughes to Sespe Hot Springs. After Hughes disappeared, the couple were questioned but not polygraphed, the police being satisfied that when they left the flooded area Hughes was still alive.

"At first I thought 'Elder' might be Lauren Willett's maiden name, but it wasn't. Nor, in checking the police reports and newspaper articles, was I able to find any description of Forsher and Elder. All I did find were their ages, both given as seventeen, and an address, from which I subsequently learned they had long since moved. All other efforts to track them down were unsuccessful.

"It appears unlikely that James Forsher and James Willett were the same person: Willett would have been twenty-four in 1970, not seven-

teen. But Lauren is a decidedly uncommon name. And, nineteen in 1972, she would have been seventeen in 1970.

"Coincidence? There have been far stranger ones in this case.

"One thing is now known, however. If an admission by one of Manson's most hard-core followers is correct, Ronald Hughes *was* murdered by the Manson Family."

By way of innuendo appellant alleged: "By publishing the book HELTER-SKELTER..., Defendants...intended that when HELTER-SKELTER was published the readers thereof would believe that Plaintiff was a participant in the alleged murder of Ronald Hughes, that he was guilty of the crime of murder or the crime of being an accomplice or accessory to murder and that Plaintiff was a member or close associate of the Manson 'Family.' The aforesaid portions of HELTER-SKELTER, when read in the context of the whole book, were, in fact, understood and believed by numerous readers of HELTER-SKELTER to mean that Plaintiff was a participant in the alleged murder of Ronald Hughes, that he was guilty of the crime of murder or of the crime of being an accomplice or accessory to murder and that he was a member or close associate of the Manson 'Family.' Said understanding and belief on the part of said readers of HELTER-SKELTER was reasonably drawn from the aforesaid portions of the book when read in the context of the whole book."

The first two causes of action of the first amended complaint seek to allege causes of action for libel essentially on the facts set forth above, distinctions between the two causes being immaterial on this appeal. The third cause of action attempts to allege an invasion of plaintiff's privacy based upon the publication of the book and its contents.

To this complaint defendants interposed general demurrers which the trial court sustained without leave to amend. This appeal is from the ensuing judgment of dismissal.

I

THE COMPLAINT FAILS TO STATE A CAUSE
OF ACTION FOR LIBEL.

We turn first to appellant's attempt to state a cause of action for libel. Libel is defined by Civil Code section 45 as "a false and

unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." As appellant points out, the definition of libel has been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation. (*Schomberg* v. *Walker* (1901) 132 Cal. 224, 227 [64 P. 290]; *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546 [343 P.2d 36]; Prosser, Torts (4th ed. 1971) § 111, p. 739 et seq.)

In determining whether a statement is libelous we look to what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the communication. (*Cameron* v. *Wernick* (1967) 251 Cal.App.2d 890, 893 [60 Cal.Rptr. 102].) "To constitute a libel it is not necessary that there be a direct and specific allegation of improper conduct, as in a pleading. The charge may be either expressly stated or implied; and in the latter case the implication may be either apparent from the language used, or of such a character as to require the statement and proof of extrinsic facts, (*inducement, colloquium,* and *innuendo*) to show its meaning. In the last case, proper allegations and proofs of the facts necessary to make the meaning of the language apparent will be required." (*Schomberg* v. *Walker, supra*, 132 Cal. at pp. 227-228.) In this connection the expression used as well as the "whole scope and apparent object of the writer" must be considered. (*MacLeod* v. *Tribune Publishing Co., supra*, at p. 546.)

In determining the propriety of the trial court's ruling on the demurrer, this court's inquiry is not to determine if the communications may have an innocent meaning but rather to determine if the communication reasonably carries with it a defamatory meaning. (*Mullins* v. *Brando* (1970) 13 Cal.App.3d 409, 414-415 [91 Cal.Rptr. 796], cert. den. *Brando* v. *Coffman* (1971) 403 U.S. 923 [29 L.Ed.2d 701, 91 S.Ct. 2231].) Just as the court must refrain from a "hair-splitting analysis" of what is said in an article to find an innocent meaning, so must it refrain from scrutinizing what is not said to find "a defamatory meaning which the article does not convey to a lay reader." (*Mullins* v. *Thieriot* (1971) 19 Cal.App.3d 302, 304 [97 Cal.Rptr. 27].)

Appellant concedes, as he must, that there is no single statement in the book which, standing alone, could be said to libel appellant.

Appellant's contention is that, when read in the context of the entire book, "the cumulative impact . . . implies that he was involved in the alleged murder [of Hughes] . . . and associated with the Manson 'family.'" In this connection he details a series of statements from the book. Appellant notes that the book proclaims to be the never-before-told complete inside story of the Manson Family by the prosecutor who put "the puzzle together." It suggests that retaliatory murders went on even after the the jailing of Manson, that the slaying of Hughes was the first of the proposed retaliatory murders and that Manson wanted Hughes dead. In addition, appellant claims that in examining the circumstances surrounding Hughes' disappearance, the book, describing appellant and Lauren Elder as teenagers, states that the two drove Hughes to a desolate camping spot; the book does not expressly state why they drove Hughes or what their connection with him was.

Appellant further develops the claimed implication by noting the representations that appellant and Elder were living together at the time, that their stories were never checked out by the police, that the last three other people known to have seen Hughes alive after appellant's and Elder's departure were polygraphed, that the cause of Hughes' death was poison and that Lauren Willett and her husband James were killed because they knew too much about the slaying of Hughes.

The book expressly rules out the probability of James Willett's being the appellant, James Forsher, because of an age differential.[4] However, the book states, "But Lauren is a decidedly uncommon name. And, nineteen in 1972, she would have been seventeen in 1970. [¶] Coincidence? There have been far stranger ones in this case." The book further states that "After Hughes disappeared, the couple were questioned but not polygraphed, the police being satisfied that when they left the flooded area Hughes was still alive." On the morning of the following day, the book recites, three other youths had seen Hughes, alone, but well and in no danger. "Since Forsher and Elder had last seen Hughes a day earlier, they apparently were not polygraphed and their story was taken at face value."

---

[4]Those most likely to deem the book defamatory to appellant are those who are acquainted with him and would therefore not identify the live appellant with the dead Willett.

In his closing brief appellant concedes "his claim is *not* based on any contention that Helter-Skelter implies that he and James Willett are the same person. . . . [T]he book makes it clear that [they] . . . are not the same person."

Under the circumstances depicted in the book it cannot be reasonably said a defamatory picture is painted of appellant. Although he and Elder had driven Hughes to the remote area, Hughes, according to the book, appears to have been left there by his choice, alive and well. There may be an inference that Lauren Elder and Lauren Willett, the latter clearly depicted as being involved in the Manson family, might have been one and the same. However, the book does not allow such an inference to be reasonably made that appellant was a member of the family. No reasonable imputation can be made that appellant was involved in Hughes' death other than being with Elder and driving Hughes to the camping area and at Hughes' election leaving him. The book's "cast of characters" lists the "Manson family members and associates;" included in this list are the names of James and Lauren Willett; absent is the name of appellant.

Instead of placing responsibility for Hughes' death on Forsher, the book suggests that Hughes was killed by two Manson family members, Bruce Davis and Nancy Pitman, who while fugitives for some time, voluntarily surrendered to police five days after Hughes was last seen alive. The book does not place Davis or Pitman with appellant or Elder during the time the latter were at Sespe Hot Springs.

In sum, the book simply establishes that appellant and Elder took Hughes to Sespe Hot Springs, that Hughes decided to stay, and that appellant and Elder left while Hughes was alive and in no danger. Possibly Lauren Willett may have been killed because she knew something of Hughes' death. Hughes may have been killed by Manson followers Pitman and Davis. However, the book neither expressly nor by fair implication charges appellant with killing or aiding or abetting the killing of Hughes.

The defamatory meaning which appellant urges that this court discern in the context of the whole book must be one that can be reasonably inferred. If the defamatory character were open to reasonable debate we would agree with appellant's assessment of the book. Here, however, the claimed defamatory nature of the book insofar as it relates to appellant is so obscure and attenuated as to be beyond the realm of reasonableness. (See *Yorty* v. *Chandler* (1970) 13 Cal.App.3d 467, 475 [91 Cal.Rptr. 709]; *Corman* v. *Blanchard* (1962) 211 Cal. App.2d 126, 137-138 [27 Cal.Rptr. 327].) In determining the defamatory nature of written material, the fact that some person might, with

extra sensitive perception, understand such a meaning cannot compel this court to establish liability at so low a threshold. Rather, the test as noted above is whether by reasonable implication a defamatory meaning may be found in the communication.

To bolster his pleadings, and, apparently in an attempt to plead extrinsic circumstances giving meaning to the alleged offending passages, appellant alleged certain "omitted facts"[5] which did not find their way into the book. However, appellant's position is not appreciably improved thereby. Even if we consider these omitted facts, we still cannot discern a defamatory meaning reasonably inferable therefrom. The additional information does not reasonably contribute to a defamatory meaning. Moreover, there is also the problem of appellant's failure to allege any special damages.

Civil Code section 45a provides: "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code."

---

[5]The allegations read as follows: "In publishing HELTER-SKELTER and in publishing the aforesaid portions pertaining to Plaintiff, which are more particularly set out in paragraph 13 above, Defendants, and each of them, deliberately, willfully, maliciously and with reckless disregard for the truth and Plaintiff's reputation, omitted the following facts: [¶] a) Shortly after James Forsher and Lauren Elder were forced to abandon her Volkswagen and hike out of Sepse [sic] Hot Springs, they were picked up by two independent witnesses and driven to Los Angeles: [¶] b) That these two independent witnesses were later questioned by police and verified the fact that they picked up James Forsher and Lauren Elder and the time at which they were picked up; [¶] c) That each of these two independent witnesses was polygraphed by the police and was shown to have been telling the truth; [¶] d) That the time at which these two independent witnesses attested to having picked up James Forsher and Lauren Elder was prior to the time three other independent witnesses, who were later polygraphed and shown to be telling the truth, reported that they talked to Ronald Hughes; [¶] e) That the rainstorm which occurred during the weekend of Hughes' disappearance was the biggest of that year in Southern California; [¶] f) That several people had previously died in flash floods occurring in the area where Hughes dispeared [sic]; [¶] g) That subsequent to Hughes' disappearance James Forsher and Lauren Elder were questioned by the police very throughly [sic] for long periods of time on more than one occasion and details of their stories were carefully checked by police. [¶] h) That James Forsher and Lauren Elder were neighbors of Ronald Hughes who drive [sic] him up to Sespe Hot Springs at his urging. [¶] i) That James Forsher and Lauren Elder had no connection whatsoever with Charles Manson, the Tate-La Bianca killers or the Manson 'Family.'"

Appellant has not effectively pleaded that he has suffered any special damages.[6] To be sure, appellant has alleged he "has suffered in an amount, which, as yet, cannot be ascertained and which will be proven at trial." Such an allegation is insufficient. Appellant should have been able to plead injury to property, business, trade, profession or occupation, if these interests have been injured even though the monetary extent might not have been ascertainable. Unless there is a special damage as defined by Civil Code section 48a, no cause of action arises. (*Mullins* v. *Thieriot, supra,* 19 Cal.App.3d 302, 304.)

## II

### ■ THE COMPLAINT FAILS TO STATE A CAUSE OF ACTION FOR INVASION OF PRIVACY.

Forsher's third cause of action, which incorporates by reference much of the first cause of action, is an attempt to allege invasion of privacy. The essential allegations concerning the alleged invasion of privacy may be summarized as follows: "[The] publication of Plaintiff's identity in connection with the events surrounding the disappearance of Ronald Hughes was of little or no informational or social value. At no time relevant herein was Plaintiff's identity newsworthy; at no time relevant herein was there any substantial reason or justification for focusing public attention on Plaintiff as an individual or any legitimate public interest in ascertaining Plaintiff's identity....[¶] At no time relevant herein did Plaintiff seek or in any way encourage the publication of his name...in connection with the disappearance of Ronald Hughes. At no time...did plaintiff attempt...to solicit publicity....At no time...was Plaintiff regarded as a public figure or did plaintiff hold such a position in the community [that] plaintiff's...involvement in the Hughes disappearance was a matter of general, legitimate or substantial public interest." Forsher further alleges that defendants published his identity with reckless disregard of the fact that the publication would be offensive to him, that the publication was offensive to him and that the publication was intentional, fraudulent, malicious and oppressive.

---

[6]Section 48a defines special damages as "damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other."

The right of privacy is a rather recent development of the common law. The celebrated article by Warren and Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193, attempted to trace the right and to provide a theoretical base for the recognition of privacy as an interest especially entitled to protection. Justice Peters, writing for this court, observed in *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 at page 533 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]: "... Warren and Brandeis perceived that it was mass exposure to public gaze, as opposed to backyard gossip, which threatened to deprive men of the right of 'scratching wherever one itches.' [Citation.]" Succinctly stated, the right is to be "left alone." (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 334, p. 2599; Rest. 2d Torts, § 652A, com. a.)

Our courts have dealt with four distinct factual settings under the heading of invasion of privacy. As identified by the late Dean Prosser, those four types of cases are: (1) intrusion upon one's physical solitude or seclusion; (2) public disclosure of private facts; (3) false light in the public eye; and (4) appropriation. (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]; Prosser, Law of Torts (4th ed. 1971) § 117, p. 804 et seq.

Plaintiff claims through his allegations that private embarrassing facts about him were revealed and that his personal character was thereby injured. The allegations of the complaint might involve either the public disclosure of private facts branch or the false light branch of the tort. On appeal, plaintiff, while not labeling which branch of the tort he contends was committed, most clearly contends that there has been public disclosure of private facts. In particular, plaintiff complains of the use of his true name and identity in connection with the admittedly newsworthy publication of the facts surrounding Hughes' disappearance and death.

■ Three required elements of the cause of action for public disclosure of private facts may be discerned from decisions of our courts. First, the disclosure of private facts must be a *public disclosure.* (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 828 [134 Cal.Rptr. 839]; *Timperley* v. *Chase Collection Service* (1969) 272 Cal.App.2d 697, 700 [77 Cal.Rptr. 782] (quoting Prosser, Law of Torts (3d ed. 1964) § 112, p. 835).) Second, the facts disclosed must be *private facts*, and not public ones. (*Kapellas* v. *Kofman, supra*, 1 Cal.3d

20, 35; *Coverstone* v. *Davies* (1952) 38 Cal.2d 315, 323 [239 P.2d 876]; *Melvin* v. *Reid* (1931) 112 Cal.App. 285, 290 [297 P. 91].) Third, the matter made public must be one which would be *offensive* and objectionable to a reasonable [person] of ordinary sensibilities. (*Gill* v. *Hearst Publishing Co.* (1953) 40 Cal.2d 224 [253 P.2d 441]; *Samuel* v. *Curtis Pub. Co.* (N.D.Cal. 1954) 122 F.Supp. 327.)

In determining whether a cause of action has been stated, we must consider certain principles relating to the First Amendment, for the right to keep information private often clashes with the First Amendment right to disseminate information to the public. Warren and Brandeis themselves noted the potential conflict between freedom of the press and the right of privacy and suggested that the right should not apply to matters of "public or general interest." (Warren & Brandeis, *supra*, 4 Harv.L.Rev. 193, 214; see also *Briscoe* v. *Reader's Digest Association, Inc., supra*, 4 Cal.3d 529, 534.)

The conflict between freedom of the press and the right of privacy was considered in *Briscoe* v. *Reader's Digest Association, Inc., supra*, 4 Cal.3d 529. In that case, Briscoe's identity as a former hijacker was revealed in a magazine article 11 years after he had committed his crime. During the intervening years Briscoe had become rehabilitated and was a respectable member of society. Briscoe filed suit against Reader's Digest claiming that it had invaded his privacy by disclosing truthful but private, embarrassing facts about his past life and that as a result, his daughter and friends had abandoned him. We concluded that Briscoe had stated a cause of action.

We recognized in *Briscoe* that the case pitted "a rehabilitated felon's right to anonymity against a magazine's right to identify him" (*id.*, at p. 534), and proceeded to analyze the nature of these competing interests. In so doing, we acknowledged the significant public interest in true reports of recent crimes and the names of persons charged with their commission and concluded they are protected by the First Amendment: "The circumstances under which crimes occur, the techniques used by those outside the law, the tragedy that may befall the victims—these are vital bits of information for people coping with the exigencies of modern life." (*Id.*, at p. 536.) Naming the suspect may legitimately put others on notice that the named individual is suspected of having committed a crime and may also persuade eyewitnesses and character witnesses to testify. (*Ibid.*)

In *Briscoe*, however, we had to go further and determine whether the public interest in reports of long past crimes was of similar strength so as to fall within the First Amendment protections. We recognized that reports of the facts of past crimes may be newsworthy and may prove educational in illustrating the reasons for and methods by which crimes are committed as well as methods of apprehension. (*Id.*, at p. 537.) We found it a different matter, however, as to the inclusion of the actor's identification: "Once legal proceedings have terminated, and a suspect or offender has been released, identification of the individual will not usually aid the administration of justice. Identification will no longer serve to bring forth witnesses or obtain succor for victims. Unless the individual has reattracted the public eye to himself in some independent fashion, the only public 'interest' that would usually be served is that of curiosity." (*Ibid.*)

We considered three factors drawn from our decision in *Kapellas v. Kofman, supra,* 1 Cal.3d 20, to determine whether the Reader's Digest story was newsworthy: "the social value of the facts published, the depth of the article's intrusion into ostensibly private affairs, and the extent to which the party voluntarily acceded to a position of public notoriety." (*Id.*, at p. 36.) Applying the three *Kapellas* criteria to the revelation of Briscoe's identity, we determined: (1) the public had little interest 11 years after the crime was committed in knowing Briscoe's identity; (2) a jury could find that the revelation of a person's criminal past is grossly offensive; and (3) Briscoe did not voluntarily consent to the publicity accorded him.

Most important to our decision, however, was the fact that the state has a compelling interest in the rehabilitative process and that a continuing threat of media disclosure of the identity of past criminals is counterproductive to this process. This additional interest, when pooled with the privacy and First Amendment interests, swung the pendulum in privacy's favor.

California courts have refrained from extending the *Briscoe* rule to other fact situations. For example, in *Johnson v. Harcourt, Brace, Jovanovich, Inc.* (1974) 43 Cal.App.3d 880 [118 Cal.Rptr. 370], the court distinguished *Briscoe* by pointing out that it was not dealing with a reformed criminal, but an honest citizen who had returned $240,000 in cash to Brinks after it had been mislaid. The *Johnson* court interpreted *Briscoe* as holding that "where the plaintiff is a past criminal and his

name is used in a publication, the mere lapse of time may provide a basis for an invasion of privacy suit." (*Id.*, at p. 891.) Lapse of time is not an issue, the court concluded, in a case where the plaintiff is not a past criminal.

Our decision in *Briscoe* was an exception to the more general rule that "once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days." (Prosser, *Privacy* (1960) 48 Cal.L.Rev. 383, 418, quoted in *Werner v. Times-Mirror Co.* (1961) 193 Cal.App.2d 111, 118 [14 Cal.Rptr. 208]; see also *Smith v. National Broadcasting Co.* (1956) 138 Cal.App.2d 807, 814 [292 P.2d 600]; Rest.2d Torts, § 652D, com. k.) As we noted in *Kappellas v. Kofman, supra*, 1 Cal.3d 20, 36: "If the information reported has previously become part of the 'public domain' or the intrusion into an individual's private life is only slight, publication will be privileged even though the social utility of the publication may be minimal."

The clash between claims of privacy and claims of a free press has also been considered in recent years by the United States Supreme Court. In *Cox Broadcasting Corp. v. Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029], an action for invasion of privacy brought upon defendant's publishing the name of plaintiff, a rape victim, in violation of a state statute, the high court invalidated the statute. In so doing and while recognizing the "impressive credentials for a right of privacy," the court determined (1) the commission of crime, prosecutions resulting from it and judicial proceedings arising from prosecutions are events of legitimate concern to the public and fall within the responsibility of the press to report the operations of government, and (2) the interest in privacy fades when the information involved already appears on the public record.[7] (*Id.*, at pp. 489-496 [43 L.Ed. at pp. 345-350].)

---

[7]Earlier, in *Time, Inc. v. Hill* (1967) 385 U.S. 374 [17 L.Ed.2d 456, 87 S.Ct. 534], the court reversed a decision of the New York Court of Appeals holding Time magazine liable under a New York statute protecting the right of privacy. Time had published an account of a play relating to an incident where the plaintiff and his family had been held hostage by escaped convicts. The magazine portrayed the play as a reenactment. Plaintiff, asserting the false light branch of the invasion of privacy tort, alleged that the article gave a false impression that the play depicted the incident. The Supreme Court held that liability could be consistent with the First Amendment only if the inaccurate portrayal were recklessly or knowingly false, thus applying the rule of *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412].

Subsequently, in *Rosenbloom v. Metromedia* (1971) 403 U.S. 29, 31, footnote 1 [29

More recently in *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667], the high court struck down a West Virginia statute making it a crime to publish, without approval of the juvenile court the name of any youth charged as a juvenile offender. The state's interest in protecting the anonymity of the juvenile to further his rehabilitation was held to be subordinate to the reach of the First Amendment, especially in the absence of the unlawful obtaining of such information or of an issue of privacy or pretrial publicity. Since *Smith* did not involve an individual right of privacy claim, its holding is of narrow scope and affords little aid in analyzing the problems before us.

▇ · From the foregoing discussion we discern certain guidelines to be considered in determining whether a report is newsworthy and thus constitutionally protected. Among the factors to consider are the depth of the intrusion into the plaintiff's private affairs, the extent to which the plaintiff voluntarily pushed himself into a position of public notoriety, the exact nature of the state's interest in preventing the disclosure, and whether the information is a matter of public record. Additionally, we look to any continued public interest in the event so that the passage of time does not per se extinguish the privilege of the publisher; if a report made reasonably contemporaneously with the incident would have been in the public interest, the weighing process continues in light of the circumstances prevailing at the time of publication.

▇ Although plaintiff concedes that the disappearance of Hughes was newsworthy, he insists that no facts were stated in the complaint or in the book which would enable the trial court to conclude that his identity was newsworthy. He admits, however, that his name was published in connection with a description of Hughes' disappearance by two Los Angeles area newspapers in December 1970.[8] Moreover, the mention of plaintiff in the book is not offensive, for the clear import of it is to ab-

---

L.Ed.2d 296, 305, 91 S.Ct. 1811], the court made it clear that the malice rule in *Hill* was confined to suits for invasion of privacy based upon false statements where a matter of public interest was involved.

[8]Appellant in his closing brief makes reference to newspaper articles, copies of which are in the clerk's transcript. Among other statements in the newspapers was the following: "James Forsher, Los Angeles, who along with his girl friend Lauren Elder, said they drove Hughes into the area November 27, was the first questioned. [¶] His story remained undenied. He told deputies he and Miss Elder were at the hot springs with Hughes, when rains came Friday (Nov. 27) [*sic*], they decided to leave the next day. Hughes told them he would stay behind. The couple drove two miles, then had to abandon Miss Elder's car, but managed to get a ride out before the roads closed."

solve plaintiff of any responsibility for Hughes' death. The depth of intrusion, if indeed there be any, is miniscule. In the book, as our prior discussion indicated, plaintiff is not treated in any great detail; his name might even escape notice in the context of the entire volume. The book clearly does not exaggerate the importance of plaintiff's role.

We are convinced that the publication of the book and plaintiff's identity did not affront any significant state interest. Unlike the plaintiffs in *Melvin* v. *Reid, supra,* 112 Cal.App. 85 and *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d 529, no rehabilitation or other social processes have been threatened. Also, unlike *Briscoe,* at the time of the publication of Helter Skelter, the event (disappearance and death of Hughes) had not become a wholly closed chapter. It is possible that the book could have elicited leads which might have explained Hughes' death in a more certain manner. At the time the book was written, Manson and events connected with the murder case were still a matter of public concern, the appeal not being decided until August 1976. (See *People* v. *Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265].)

Weighing the interest of plaintiff, the state and public, as we must under the cases cited, we conclude that the attempt to plead a cause of action for invasion of privacy must fail.

### III

#### CONCLUSION

The judgment of dismissal entered upon the sustaining of the demurrer is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Newman, J., concurred.