Linda HOFFMAN–PUGH,
Plaintiff–Appellant,

v.

Patricia RAMSEY, John Ramsey,
Defendants–Appellees.

No. 02–12642.

United States Court of Appeals,
Eleventh Circuit.

Nov. 19, 2002.

Darnay Hoffman, Law Offices of Darnay Hoffman, New York City, for Plaintiff–Appellant.

James C. Rawls, Eric P. Schroeder, Stephen Derek Bauer, Powell, Goldstein, Frazer & Murphy, LLP, L. Lin Wood, Jr., Atlanta, GA, for Defendants–Appellees.

Before CARNES, HILL and FARRIS,* Circuit Judges.

CARNES, Circuit Judge:

This diversity case arises from a book written by John and Patricia Ramsey about the police investigation into their daughter's murder. Linda Hoffmann–Pugh, the Ramseys' former housekeeper, brought suit against the Ramseys, alleging libel and slander under Georgia law in connection with the book and its promotion. The district court granted the Ramseys' motion to dismiss Hoffmann–Pugh's complaint under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. This appeal followed. For the reasons we will discuss, we affirm.

The Ramseys' young daughter, JonBenet, was murdered in 1996 in Boulder, Colorado, and the investigation that followed received intense media scrutiny and public attention. In March 2000, the Ramseys published a book about the investigation into their daughter's murder, entitled *The Death of Innocence: The Untold Story of JonBenet's Murder and How Its Exploitation Compromised the Pursuit of Truth* (Thomas Nelson Publishers 2000).

* Honorable Jerome Farris, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

Hoffmann–Pugh's complaint alleges that the Ramseys libeled her in particular in the following passage from their book, describing the Ramseys' interactions with the police after JonBenet was discovered missing but before her body was found in the Ramseys' house:

> The police ask Patsy these same questions about who might have been angry or acting strangely, and she begins to think about our cleaning lady. Linda Hoffmann–Pugh had called Patsy a couple of days before Christmas, very distraught and in tears. Linda said her sister, who was also her landlord, was going to evict her if she didn't come up with the past-due rent. She asked Patsy if she could borrow twenty-five hundred dollars to cover it. Patsy had consoled Linda and agreed to lend her the money. In fact, Patsy had intended to leave the check for Linda on the kitchen counter before leaving for Michigan; Linda would let herself in the house and pick it up while we were gone for the holidays.

> Patsy remembers that her mother, Nedra Paugh, had said that Linda had remarked to her at one time, "JonBenet is so pretty; aren't you afraid that someone might kidnap her?" Now those comments seem strangely menacing.

> Finding the phone number in her digital Rolodex, Patsy tells a police officer where Linda lives in Ft. Lupton, Colorado. Patsy later tells me she was thinking, *If it's Linda, it's okay, because she is a good, sweet person. She is just upset. She may need the money, but she won't hurt JonBenet.*

> The police tell us they will arrange for the Ft. Lupton police to drive by Linda's house to see if they notice anything un-

usual, but they don't want to alert anyone there that they are being watched.

*The Death of Innocence, supra,* 19–20.

Hoffmann–Pugh alleges in her complaint that the statements in this passage are false, that the Ramseys know that they are false, and that they were made with the intent to create an impression that Hoffmann–Pugh is a suspect in the murder. Hoffmann–Pugh claims that her sister was not going to evict her and that she did not make the above statement to Nedra Paugh or anyone else. She also claims that the statement *"If it's Linda, it's okay, because she is a good, sweet person. She is just upset. She may need the money, but she won't hurt JonBenet"* is a deliberate falsehood because Hoffmann–Pugh did not murder JonBenet. Hoffmann–Pugh claims she knows that this passage is a deliberate falsehood because Patricia Ramsey killed her daughter and wrote a ransom note to cover it up and John Ramsey knew this and helped his wife in the cover-up. Both John and Patricia Ramsey deny any involvement in the murder of their daughter.

The complaint alleges that the Ramseys repeated the false allegation that Hoffmann–Pugh was a murder suspect in television interviews promoting their book and in the print media. It identifies no specific statements outside the book, but alleges that the unidentified statements constitute libel and slander *per se.* The complaint also alleges that as a result of those statements and the book Hoffmann–Pugh has been the subject of heightened, unwelcome, and unflattering media scrutiny, and has been exposed to hatred, contempt, and ridicule in her small community.

The Ramseys moved to dismiss the complaint for failure to state a claim. The district court concluded that because Hoffmann–Pugh did not identify in her complaint or in her response to the Ramseys'

motion to dismiss any specific offending oral statements the Ramseys made to the media, her claims based upon statements outside the book had been abandoned. The district court then granted the Ramseys' motion to dismiss because the passage from the book that Hoffmann–Pugh relied upon for her libel claim was nondefamatory as a matter of law or, alternatively, because the statements in the passage were nonactionable statements of opinion. Hoffmann–Pugh appeals the district court's judgment insofar as it concerns the passage in the book, but does not contest the ruling that she abandoned her claims involving statements made outside the book.

 We review a dismissal pursuant to Rule 12(b)(6) *de novo,* applying the same standard as the district court did. *S. Fla. Water Mgmt. Dist. v. Montalvo,* 84 F.3d 402, 406 (11th Cir.1996). The allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff. *Linder v. Portocarrero,* 963 F.2d 332, 334 (11th Cir.1992) (citation omitted). A complaint may not be dismissed unless the plaintiff can prove no set of facts which would entitle him to relief. *Id.* (citations omitted).

 Under Georgia law, libel is "a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51–5–1(a). Libel *per se* consists of a charge that one is guilty of a crime, dishonesty, or immorality, and the words must be defamatory on their face.[1] *Zarach v. Atlanta Claims Ass'n,* 231 Ga.App. 685, 688, 500 S.E.2d 1 (1998); *Eidson v.*

*Berry,* 202 Ga.App. 587, 588, 415 S.E.2d 16 (1992) (citation omitted). An essential element of libel is a published defamatory statement. *Mead v. True Citizen, Inc.,* 203 Ga.App. 361, 362, 417 S.E.2d 16 (1992). In determining whether a statement is defamatory, a court should read and construe the publication as a whole, *id.,* and in the sense in which the readers to whom it is addressed would understand it. *Ledger–Enquirer Co. v. Brown,* 214 Ga. 422, 424, 105 S.E.2d 229 (1958); *Mead,* 203 Ga.App. at 362, 417 S.E.2d 16.

 As a general rule, the question of whether a published statement is defamatory is a question for the jury. *Mead,* 203 Ga.App. at 362, 417 S.E.2d 16 (citation omitted). However, if the statement is not ambiguous and can reasonably have but one interpretation, the question is one of law for the court. *Id.* After reading and construing the publication as a whole, the court "may find that it is not defamatory, that it is defamatory, or that it is ambiguous and the question is one for a jury." *Id.* (citation omitted).

 The "publication" at issue here is the entire book, which was properly before the court on the motion to dismiss because Hoffmann–Pugh referred to it in her complaint and it is central to her claims. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278–81 & n. 16 (11th Cir.1999) (in securities class action, relevant documents filed with SEC could be considered on motion to dismiss because there was little question of their authenticity, the plaintiffs were well aware of their existence, and the statements at issue in the case should have been read in context). Neither party disputes that the entire book was properly

---

1. Georgia also recognizes a claim for libel *per quod,* but the plaintiff must plead and prove special damages to prevail on that claim. *Zarach v. Atlanta Claims Ass'n,* 231 Ga.App. 685, 689, 500 S.E.2d 1 (1998). Hoffmann–Pugh did not plead libel *per quod* in this case and has not alleged any special damages.

before the district court and is properly before this Court. We must examine the entire book in order to determine if the statements about which Hoffmann–Pugh complains are unambiguous and can have but one reasonable interpretation, or whether the question of their meaning is for the jury.

 Hoffmann–Pugh contends that the statements in the passage we have quoted from the book are capable of conveying to the average reader the impression that she is a legitimate murder suspect. She asserts that those statements, taken in the context of a book about an unsolved murder that also points out various "suspects" the Ramseys believe should be investigated, show that the Ramseys intended to convey the impression that Hoffmann–Pugh had kidnapped, if not actually murdered, their daughter. She argues that the passage, at the very least, imputes the crime of kidnapping to her.

However, when the book as a whole is considered, the statements in the passage at issue are not defamatory under Georgia law. First, the passage does not state that either the Ramseys or the police consider Hoffmann–Pugh a suspect or that they believe that she had actually committed any crime. In fact, the passage suggests that the Ramseys did not believe that Hoffmann–Pugh would hurt their daughter *if* she had kidnapped her and reflects their belief that Hoffmann–Pugh was a "good,

sweet person." Not only that, but a few pages later in the same chapter, the Ramseys point out that their daughter was not actually kidnapped, but instead was murdered in their house, which means the statements cannot be construed as suggesting that Hoffmann–Pugh committed the crime of kidnapping (or that anyone else did, for that matter). *See The Death of Innocence, supra,* 22–23.[2]

Second, later in the book the Ramseys present a profile of the person they believe murdered their daughter and set forth the details of the profile. According to them, the murderer is a male, age 25 to 35, who is either a former convict or has been around hardened criminals, and who had access to a stun gun. *Id.* at 363–364. The Ramseys' profile of the suspect does not remotely resemble Hoffmann–Pugh.

Throughout the book, the Ramseys describe several people that they think should have been investigated further by the police. *Id.* at 165–68, 202–05, 221, 310–11, 361–370. They even identify some of these people by name and say that at least one of them was on their "suspect list."[3] *Id.* at 205, 221. Hoffmann–Pugh's name appears only once in the part of the book containing these descriptions, and the way it appears does not permit a reasonable inference that she is the murderer. The Ramseys recount that the police had checked up on Hoffmann–Pugh after the

---

2. We realize that the crime of kidnapping in Colorado, as in many states, is committed when a person is taken without consent and without lawful justification from one place to another, even if there is no intent to hold that person for ransom. *See* Colo.Rev.Stat. § 18–3–302 (second degree kidnapping). So, it may well be that the Ramseys' daughter was kidnapped, but the sense in which the word is used in the relevant parts of the book is kidnapping for ransom.

3. One person named as a suspect and on the "suspect list" also sued the Ramseys for libel,

*Wolf v. Ramsey,* No. 00–CV–1187–JEC (N.D.Ga. Feb. 1, 2001). Hoffmann–Pugh relies in part in her brief on the unpublished opinion in *Wolf,* in which the court denied the Ramseys' motion to dismiss the claim because the plaintiff had alleged sufficient facts to state a claim for libel. In *Wolf,* however, the plaintiff alleged that the Ramseys named him as a "suspect" in the murder and that the Ramseys stated he was on their "suspect list." That is not the situation before us.

Ramseys had mentioned her name to the police on the day of the murder because she had been acting strangely and had asked to borrow money:

> We had heard that detectives had interviewed Linda and her husband and had taken hair, blood, and saliva samples. Certainly we appreciated her comments about us during her television and radio appearances. When she was asked if she thought we killed JonBenet, she replied, "No." Pressed further by the question, "What will you do if it turns out that they did kill JonBenet?" Linda replied, "I'll never trust anybody ever again."

*Id.* at 166. This passage does not imply that the Ramseys believe Hoffmann–Pugh was involved in any way in the murder of their daughter. Just a page later, they say that they "still cannot believe that anyone we know committed this terrible crime, and we have told the police that." *Id.* at 167. *See also Cox Enters., Inc. v. Nix*, 274 Ga. 801, 803–04, 560 S.E.2d 650 (2002) (discussion of plaintiff, set apart from discussion of others accused of criminal conduct in the same article, was not libelous). Given that the Ramseys know Hoffmann–Pugh, that statement can only mean that they do not believe that she committed the crime and have told the police that.

Reading and construing the book as a whole, it does not accuse Hoffmann–Pugh of murder or create a general impression that she is a murder suspect. There is no ambiguity, and the parts of the book that relate to her have only one reasonable interpretation—a nondefamatory one. Therefore, the book is, as a matter of law, not defamatory of Hoffmann–Pugh.

Hoffmann–Pugh argues that this case is analogous to the Georgia Court of Appeals case *Harcrow v. Struhar,* 236 Ga.App. 403, 511 S.E.2d 545 (1999), and that *Harcrow* precludes the conclusion we have reached. In *Harcrow,* the plaintiffs brought suit against a neighbor who published a writing throughout the neighborhood implying that the plaintiffs shot his cat and so were guilty of the crime of cruelty to animals. *Id.* at 405, 511 S.E.2d 545. The writing stated:

> Now, the only people in the neighborhood who have expressed hatred for cats are [the plaintiffs], and I'm not saying that they are responsible for this atrocious act, that will be determined by the Smyrna Police, but they are the prime suspects ... And, really, such an act of violence would be in character for someone driven by hatred.

*Id.* In holding that the evidence was sufficient for the jury to find that the writing was libelous *per se*, the Georgia appellate court noted that the inclusion of the statement that, "I'm not saying that they are responsible for this atrocious act," did not negate other portions of the writing that the jury could conclude were the equivalent of accusing the plaintiffs ("the prime suspects") of the crime of cruelty to animals. *Id.* at 404, 511 S.E.2d 545.

Hoffmann–Pugh argues that the disclaimer held insufficient in *Harcrow* is like the Ramseys' "disclaimer" that she was a good, sweet person who would not hurt their daughter. However, this case is different from *Harcrow.* The Ramseys' book does not name Hoffmann–Pugh as a suspect—let alone the "prime suspect"—and when read in its entirety not only does not imply that she is a suspect but actually indicates to the contrary. It does not say that the crime would be in character for her but, instead, exactly the opposite. The conclusion we have reached is not inconsis-

tent with the *Harcrow* decision.[4]

The judgment of the district court is AFFIRMED.

---

4. One further argument of Hoffmann–Pugh deserves brief mention. She contends that the district court erred in relying on a California Supreme Court case, *Forsher v. Bugliosi,* 26 Cal.3d 792, 163 Cal.Rptr. 628, 608 P.2d 716 (1980), in its opinion instead of focusing on Georgia law. The short answer is that it does not matter. Our scope of review is *de novo,* and we have not relied at all upon *Forsher* or any other California decision.