# IN THE SUPREME COURT OF TEXAS

═══════════

No. 14-0456

═══════════

KBMT OPERATING COMPANY, LLC, KBMT LICENSE COMPANY, LLC,
BRIAN BURNS, JACKIE SIMIEN AND TRACY KENNICK, PETITIONERS,

v.

MINDA LAO TOLEDO, RESPONDENT

═══════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS

═══════════

JUSTICE BOYD, joined by JUSTICE JOHNSON and JUSTICE WILLETT, dissenting.

It is just after ten o'clock at night, and the local news is on the television. A news anchor sits behind the desk. Beside her on the screen, a large graphic displays a medical symbol and the words "DOCTOR PUNISHED." Reading from a script, the anchor announces:

> A [local] pediatrician has been punished by the Texas Medical Board after the Board found she engaged in sexual contact with a patient and became financially involved with a patient in an inappropriate manner. Dr. Minda Lao Toledo will have to complete sixteen hours of continuing medical education, including eight hours of ethics and eight hours of risk management, and pay an administrative penalty of three thousand dollars. Toledo is a native of the Philippines and has been practicing medicine in Texas for five years.

The station repeats the story verbatim the next day on the early-morning news and again during the noon-hour broadcast. It repeats it again during the five o'clock news that evening, but this time

the anchor says that "the Board found [the pediatrician] engaged in sexual contact with *an adult* patient."

The Court concludes today that no ordinary viewer of the first three broadcasts could have concluded from those broadcasts that the Board disciplined the "pediatrician" for engaging in sexual contact with a *pediatric* "patient." *Ante* at ___. I disagree. Perhaps some ordinary viewers did not reach that conclusion. Maybe even most did not. But Dr. Toledo provided evidence that *some* viewers who watched the broadcasts in fact did understand that the Board punished her for engaging in sexual contact with a minor. Based on that evidence and the broadcasts' language, a trial judge and three appellate justices all agreed that an ordinary viewer *could* have reached that conclusion. I agree with them.

The Court concludes as a matter of law that every ordinary viewer who watched the broadcasts necessarily must have understood the broadcasts the way the Court now construes them. *Ante* at ___. As a result, the Court determines that the trial judge, the appellate justices, and at least some who actually watched the broadcasts are either not ordinary or were just plain wrong. Because Toledo provided some evidence that an ordinary viewer could have understood the broadcasts to assert that she engaged in sexual contact with a pediatric patient, our jurisprudence makes it the jury's duty, not this Court's, to decide whether the broadcasts were defamatory, false, or privileged. The Court's result-driven approach ignores our own precedent and the applicable standard of review and thereby usurps the jury's role in this case.

I also cannot join the Court's holding that the broadcasts' "truth" must be "measured against" the Board's proceedings and not against the actual underlying facts. Whether that holding

2

is correct, it is irrelevant to the outcome of this case in light of the Court's matter-of-law conclusion regarding the broadcasts' meaning. If, as the Court concludes, no ordinary viewer could have understood the broadcasts to mean that the Board punished Toledo for engaging in sexual contact with a pediatric patient, then it does not matter whether we compare the broadcasts to the Board's proceedings or to the actual underlying facts because the broadcasts accurately described both. The Court's holding regarding the broadcasts' "truth" may be correct, but it implicates numerous statutory, constitutional, and practical issues far more complex than the Court's brief analysis suggests. The Court should reserve its holding for a case in which it gives those issues due consideration and in which the holding actually matters.

I respectfully dissent.

## I.
## The Medical Board Proceedings

Dr. Minda Toledo is a Port Arthur pediatrician in her mid-50s. Several years ago, a man she was dating, who was several years older, requested that she obtain and administer to him testosterone and human growth hormone that another physician had prescribed. Toledo admits that she agreed to his requests and provided him with the drugs. Toledo acknowledges that she was involved in an intimate sexual relationship with the man during this time.

After the relationship ended, the Texas Medical Board received a complaint alleging that Toledo engaged in "unprofessional sexual misconduct" by administering drugs to a person with whom she was engaged in an intimate relationship and by failing to maintain proper records of that treatment. After receiving the Board's notice of the alleged violations, Toledo participated in

3

a settlement conference with the Board's staff and entered into an agreed order that found that she had engaged in improper conduct and assessed sanctions against her.

The agreed order noted that Toledo is "primarily engaged in the practice of pediatric medicine" and board-certified by the American Board of Pediatrics. It identified the man with whom she was "engaged in an intimate relationship" only as "JC," and did not state his age. However, the order provided details that indicated that JC was an adult, including:

- "while engaged in an intimate relationship with JC[, Toledo] injected JC with testosterone and human growth hormone without prescriptions and documentation in a medical record";

- "[Toledo] entered into a relationship with JC, who was not her patient at the time, and who was being prescribed testosterone to self-administer by another physician;"

- "JC related that his diagnosis was an autoimmune disease, for which testosterone is non-therapeutic;"

- "[Toledo] used her medical license to obtain testosterone and human growth hormone for JC while she was in an intimate relationship with him, and administered these substances to him;" and

- "[Toledo] accepted gifts from JC during the time she was treating him."

The agreed order further provided that, based on these findings, the Board concluded that Toledo violated Board rules by:

- failing to "maintain adequate medical records;"

- engaging in "unprofessional or dishonorable conduct that is likely to deceive or defraud the public or injure the public" by:

  o "engaging in sexual contact with a patient;" and

  o "becoming financially or personally involved with a patient in an inappropriate manner;"

4

- "prescribing or administering a drug or treatment that is nontherapeutic in nature or nontherapeutic in the manner the drug or treatment is administered or prescribed;" and

- violating a "state or federal law" through an act that "is connected with the physician's practice of medicine."

As sanctions for the violations, the agreed order required Toledo to take additional medical-ethics courses, successfully pass the Board's medical-jurisprudence exam, and pay an administrative penalty. As mitigating factors, the order expressly noted that Toledo had cooperated in the Board's investigation and had agreed to the order. The Board finally approved the order at its meeting in August 2012.

As is its custom, the Board issued a press release a week later, announcing the disciplinary actions against fifty-five different physicians that it had approved in its August meeting. In a list of those disciplined for "Unprofessional Conduct," the press release stated that the Board found that Toledo "behaved unprofessionally when she engaged in sexual contact with a patient and became financially or personally involved with a patient in an inappropriate manner." The press release explained that the Board and Toledo had

> entered into an Agreed Order requiring Dr. Toledo to complete 16 hours of CME including eight hours in ethics and eight hours in risk management, pass within one year and within three attempts the Medical Jurisprudence Exam, complete the professional boundaries course offered by the Vanderbilt Medical Center for Professional Health or a similar course offered by the University of California San Diego Physician Assessment and Clinical Education (PACE) program, and pay an administrative penalty of $3,000 within 90 days.

The press release identified Toledo as a Port Arthur physician, but it did not mention that Toledo was a pediatrician or identify any "patient" to whom it referred.

5

## II.
## The Broadcasts

Beaumont-based television station KBMT received a tip about the disciplinary action against Toledo and a copy of the press release soon after its publication. KBMT employees conducted further investigation and located Toledo's "physician profile" on the Board's website. The profile stated that Toledo attended medical school in the Philippines and had been licensed in Texas for five years. It also quoted the press release's summary of the disciplinary action against Toledo and provided a link to the agreed order. Unlike the press release, the profile identified Toledo as a pediatrician.

During its 10 p.m. news show on September 10, 2012, KBMT's anchor read the broadcast at issue, beginning with the phrase, "A Port Arthur pediatrician has been punished by the Texas Medical Board after the Board found she engaged in sexual contact with a patient . . . ." The next day, KBMT repeated the report three times, but the last time the anchor stated that the Board punished Toledo for engaging in sexual contact with "an adult patient," instead of just "a patient." According to Toledo's sworn affidavit, "immediately" after these broadcasts, she and the staff at her medical office "began receiving both personal and telephonic inquiries" that made it "apparent" that her "patients were concerned that [she] had been engaged in sexual contact with pediatric patients." And she later learned that "patients had contacted other physicians, referral physicians[,] and colleagues who knew [her] to inquire about these outrageously false representations."

Toledo sued KBMT and three of its employees (collectively, KBMT) for defamation, alleging that the broadcasts had effectively and falsely reported that the Board sanctioned her for

6

engaging in sexual contact with a pediatric patient. KBMT moved to dismiss the suit under the Texas Citizens Participation Act, TEX. CIV. PRAC. & REM. CODE § 27.003(a), arguing that the broadcasts accurately and truthfully reported the information contained in the Board's press release and Toledo's physician profile. The trial court denied the motion, and the court of appeals affirmed. 434 S.W.3d 276 (Tex. App.—Beaumont 2014).

## III.
## Evidence of the Broadcasts' "Gist"

To avoid dismissal under the Texas Citizens Participation Act (TCPA), Toledo bore the burden to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim." TEX. CIV. PRAC. & REM. CODE § 27.005(c). Prima facie evidence is "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)). "Prima facie proof is not subject to rebuttal, cross-examination, impeachment[,] or even disproof." *Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 757 (Tex. 1993).

The key dispute here is whether Toledo made the required prima facie showing that the broadcasts were false.[1] The truth or falsity of a defamatory statement is determined by the "substantial truth" standard, under which a statement is false only if its meaning is more damaging

---

[1] Generally, a plaintiff claiming defamation must prove that the statement was defamatory but need not prove that it was false; instead, the defendant bears the burden to prove the statement's truth as an affirmative defense. *See* TEX. CIV. PRAC. & REM. CODE § 73.005(a) ("The truth of the statement . . . is a defense to the action."); *Neely v. Wilson*, 418 S.W.3d 52, 56 (Tex. 2013) ("Truth is a defense to all defamation suits."). But when, as here, "a private figure sues a media defendant over defamatory statements that are of public concern, the plaintiff has the burden of proving falsity" along with the burden of proving that the statements were defamatory. *Neely*, 418 S.W.3d at 66 n.21.

to the plaintiff's reputation than a truthful statement would have been. *Neely*, 418 S.W.3d at 63; *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000); *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990). The statement's meaning is determined by construing the publication or broadcast "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Turner*, 38 S.W.3d at 114. We have often referred to this meaning as the statement's "gist." *See Lipsky*, 460 S.W.3d at 594; *Neely*, 418 S.W.3d at 63–64; *Turner*, 38 S.W.3d at 115.

"Assessing a broadcast's gist is crucial" to determining whether it was more harmful to the plaintiff's reputation than a truthful broadcast would have been. *Neely*, 418 S.W.3d at 63. A broadcast could include some false details and yet be substantially true if its gist is not more damaging to the plaintiff's reputation than a broadcast without the errant details would have been. *Turner*, 38 S.W.3d at 115. Conversely, a broadcast containing only truthful details is not substantially true if it omits or juxtaposes truthful facts "and thereby gets the story's 'gist' wrong." *Id.* at 114–15; *see also Lipsky*, 460 S.W.3d at 594 (stating that a publication may be false even though "some of the statements may, in isolation, not be actionable"). Thus, "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Turner*, 38 S.W.3d at 115; *see also Huckabee v. Time Warner Entm't Co., L.P.*, 19 S.W.3d 413, 425 (Tex. 2000) ("A broadcaster's omission of facts may be actionable if it so distorts the viewers' perception that they receive a substantially false impression of the event.").

8

To establish that KBMT's broadcasts were false, Toledo bore the burden to prove that the broadcasts' gist was more damaging to her reputation than a truthful broadcast would have been. *Neely*, 418 S.W.3d at 63. At this stage of the litigation, however, to defeat KBMT's motion to dismiss, the TCPA required Toledo to present only a prima facie case that the broadcasts were false. So we must determine here not whether Toledo convincingly proved that the broadcasts were false but whether she submitted the "minimum quantum of evidence necessary to support a rational inference" that they were false. *Lipsky*, 460 S.W.3d at 590. In other words, the question before us is whether Toledo submitted just some clear and specific evidence that "the words used [in the broadcast were] reasonably capable of a defamatory meaning." *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654 (Tex. 1987). If the broadcasts' "language is ambiguous or of doubtful import," it is a jury's role, and not a court's, to "determine the statement's meaning and the effect the statement's publication has on an ordinary reader." *Id.* at 655.

The Court explained in *Turner* that, when the Court considers the falsity of an allegedly defamatory statement under a no-evidence standard of review, the question for us is not whether an ordinary viewer *would* have understood the broadcasts' gist to be false or defamatory, but whether a "reasonable jury *could* have found the broadcast to be false or defamatory." *Turner*, 38 S.W.3d at 117 (emphasis added) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983) (stating that the test for the "no evidence" rule is whether reasonable minds could differ on an issue of vital fact); *Musser*, 723 S.W.2d at 654–55 (stating that defamatory meaning is only a question of law if reasonable minds cannot differ)). Thus, although the Court acknowledged in *Turner* that a statement's meaning is "based upon how a person of ordinary intelligence *would* perceive it,"

9

*Turner*, 38 S.W.3d at 114 (emphasis added), it respected the applicable no-evidence standard of review and found that some evidence supported a finding that the statements were false because "a reasonable fact-finder *could* determine that the broadcast, through omission of critical facts and juxtaposition of others, left a substantially false impression," *id.* at 117 (emphasis added).[2] The *Turner* Court did not get confused over the meanings of "would" and "could." Rather, it recognized that although proving falsity requires proof that establishes that an ordinary viewer "would" have understood a false gist, the no-evidence standard of review requires only evidence that an ordinary viewer "could" have understood a false gist, or that an ordinary juror "could" conclude that the gist was false.

Following *Turner*, the Court recently employed the same approach in *Neely*, in which it reversed a summary judgment for the defendants because the plaintiff "raised a genuine issue of material fact as to the truth or falsity" of a broadcast's gist by submitting evidence that "a person of ordinary intelligence *could* conclude that the gist of the broadcast at issue was" false. *Neely*, 418 S.W.3d at 56–57 (emphasis added). As in *Turner*, the *Neely* Court acknowledged that we "determine a broadcast's gist or meaning by examining how a person of ordinary intelligence *would* view it." *Id.* at 64 (emphasis added). But because we applied a no-evidence review standard in that case to determine whether "more than a scintilla of probative evidence" existed, *id.* at 59,

---

[2] *See also Turner*, 38 S.W.3d at 117–18 (concluding that a reasonable "viewer *could* reasonably believe" that the broadcasts communicated a false message (emphasis added)); *id.* at 118 (finding that a segment of the broadcast "*could* . . . suggest misleadingly" false facts about the plaintiff (emphasis added)); *id.* at 119 ("a juror *could* conclude" false facts about the plaintiff (emphasis added)); *id.* ("a reasonable viewer *could* conclude that the broadcast mischaracterized" the true facts (emphasis added)); *id.* ("[T]he broadcast as a whole *could* leave a false and defamatory impression." (emphasis added)); *id.* at 124 ("[T]he jury *could* have reasonably found the broadcast's assertion . . . to be false." (emphasis added)).

10

the Court reversed the summary judgment because "a person of ordinary intelligence *could* conclude the gist of the broadcast was [false]," *id.* at 66 (emphasis added).[3] Thus, although we "examine substantial truth based on what a person of ordinary intelligence *would* understand the gist or meaning of the broadcast to be[, . . .] [h]ere, a person of ordinary intelligence *could* conclude that the gist of the broadcast was" false. *Id.* at 76 (emphases added).

In the same way, here, as in *Turner* and *Neely*, the question is whether Toledo submitted *some* evidence that the gist of KBMT's broadcasts was false. *See Werner v. Colwell*, 909 S.W.2d 866, 869 (Tex. 1995) (stating that plaintiff "has failed to establish a prima facie case" when "there is no evidence" to support a necessary finding); *Seaman v. Seaman*, 425 S.W.2d 339, 341 (Tex. 1968) (holding that because the statute treats evidence of a promissory note as "prima facie evidence that it was completed in accordance with authority," evidence of the note was some evidence that it was so completed). *Turner* and *Neely* confirm that to apply the proper standard of review here, we must determine whether Toledo submitted the "minimum quantum of evidence necessary to support a rational inference" that the broadcasts were false by determining how an ordinary viewer "could" have understood the broadcasts, considering them as a whole in light of the surrounding circumstances. *Lipsky*, 460 S.W.3d at 590; *Turner*, 38 S.W.3d at 114.[4]

---

[3] *See also Neely*, 418 S.W.3d at 69 (concluding that "an ordinary viewer *could* conclude" that it communicated a false message (emphasis added)); *id.* at 75 ("[T]he gist of the broadcast to a person of ordinary intelligence *could* be [false]." (emphasis added)).

[4] Notably, the Court's decision in *Turner* was not unanimous. The CHIEF JUSTICE, who authors the Court's opinion today, expressly disagreed with the Court's holding in *Turner* that a broadcast "was false because it omitted facts that *could* have led a reasonable viewer to form a less adverse impression of the public figure." *Turner*, 38 S.W.3d at 131 (HECHT, J., concurring and dissenting) (emphasis added). Just as he does in the Court's opinion today, he expressed in *Turner* his concern that the "could" standard for measuring falsity was too "lenient" and "significantly threatens open and vigorous discourse about matters of public interest." *Id.*; *see also ante* at n.26 (expressing concern that the "practical effect of such a rule would, of course, be to chill media reporting of matters not only of concern to

The "truth" in this case is that Toledo engaged in sexual conduct with her 60-year-old boyfriend to whom she was also administering medications that other doctors had prescribed, and the Board disciplined her for that conduct. Toledo contends that the gist of KBMT's broadcasts, however, was that the Board disciplined her for having sexual contact with a pediatric patient, which would be inarguably more damaging to her reputation than if the gist were that she had sexual contact with an adult patient. I conclude that Toledo submitted sufficient evidence to establish a prima facie case that an ordinary viewer could have understood the broadcasts in that way.

I am persuaded in part by the evidence that KBMT chose to begin each broadcast by referring to Toledo as a "pediatrician" who was "punished" for engaging in "sexual contact" with a "patient." *See Turner*, 38 S.W.3d at 117–18 (holding that "a viewer could reasonably believe" a

---

the public but critical to the public's understanding of, and confidence in, the working of their government"). Because, in his view, "almost any fact favorable to the subject of a news report, but omitted from its broadcast, *could* cause a reasonable person to think differently, and perhaps better, about the subject," he would have adopted a standard that requires "clear and convincing evidence that but for the omission or juxtaposition a reasonable person *would* have had a better opinion of the public figure." *Turner*, 38 S.W.3d at 131 (HECHT, J., concurring and dissenting). He dissented from that part of the *Turner* majority opinion because, "if the standard for determining falsity is nothing more than what a reasonable viewer *could* have thought, almost any omission can pass." *Id.* at 133.

What the CHIEF JUSTICE overlooked in *Turner*, however, and what the Court overlooks again today, is the standard of review that governs our analysis in this interlocutory appeal from the denial of a motion to dismiss under the TCPA. The Court confirmed in *Turner* and in *Neely* that the no-evidence standard requires only evidence that an ordinary viewer "could" have understood the broadcast to be less favorable to the plaintiff than a truthful broadcast would have been. And to avoid dismissal under the TCPA, the claimant need only submit prima facie evidence of that fact. Today the Court purports to apply the *Turner* standard by repeatedly referring to what an ordinary viewer "could" have understood. *Ante* at ___, ___, ___. In reality, however, it simply circumvents the *Turner* standard and imposes the far less "lenient" standard the CHIEF JUSTICE preferred in *Turner* by imposing the Court's own personal assessment of the broadcasts on all ordinary viewers. Comparing *Turner* with today's decision illustrates the simple truth that how we articulate a legal standard is never as crucial as how we apply it. We can say the standard is what an "ordinary listener could" have understood, but if we then conclude that an ordinary listener could only have understood the broadcasts to mean what *we* understand them to mean, the standard is rendered meaningless. Despite the language used, the Court's approach today is more like the approach the CHIEF JUSTICE urged in his dissent in *Turner* than the one the *Turner* majority adopted and applied.

12

falsity from the broadcast's language, "especially in light of the broadcast's introduction"). Although this introductory statement is technically true, an ordinary viewer could reasonably conclude from this opening reference to a "pediatrician" and her "patient" that that the patient was a pediatric patient. By referring to a "pediatrician" and her "patient," the broadcasts' opening statement could have generated a "sting" in the mind of the ordinary viewer that otherwise would not have existed. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (describing "the gist" as "the sting[] of the libelous charge" (quoting *Heuer v. Kee*, 15 Cal. App. 2d 710, 714 (1936))). From the first sentence, the broadcasts could have communicated to the ordinary viewer otherwise truthful facts "in such a way that they create[d] a substantially false and defamatory impression by . . . juxtaposing facts in a misleading way." *Turner*, 38 S.W.3d at 115.

Noting that we must determine the gist by considering the broadcasts as a whole, *Turner*, 38 S.W.3d at 114, the Court concludes that the remainder of the report altered the gist so that no ordinary viewer of the entire report could have concluded that the Board punished a pediatrician for engaging in sexual contact with a pediatric patient. *Ante* at ___. First, the Court asserts that any ordinary viewer would know that any physician who had improper sexual contact with a child would be prosecuted for a crime by the district attorney, not by the Texas Medical Board. *Ante* at ___. I disagree that this presumed knowledge decisively alters the gist that the opening statement creates. The broadcasts reported only on the Board's findings and actions and made no reference at all to any criminal charges or prosecutions. Any viewer who listened carefully enough to wonder why Toledo was not being prosecuted also could have reasonably concluded that any criminal prosecution would be the subject of a separate proceeding and separate news reports.

13

Next, the Court asserts that no ordinary viewer "could reasonably have thought that such a crime would be punished with a slap on the wrist—a few hours of continuing education and a small fine." *Ante* at ___. I disagree that the nature of the Board's sanctions would necessarily have altered the broadcasts' gist. Instead, like the unanimous court of appeals, I

> do not believe that an average viewer is sufficiently familiar with the scope of the [Board's] disciplinary authority—including the administrative rules and regulations governing the range of disciplinary sanctions and penalties available to the [Board], the mitigating factors that the [Board] is authorized to consider in imposing a sanction or penalty, or the effect of such factors on any particular sanction or penalty—such that the statements in the broadcast would clarify in the mind of the average viewer that the patient referenced in the broadcast is not a child.

434 S.W.3d at 286.

Noting that the broadcasts stated that Toledo was punished not only for engaging in "sexual contact with a patient," but also for becoming "financially involved with a patient in an inappropriate manner," the Court next concludes that no ordinary viewer could "reasonably have thought that a pediatrician would be financially involved with a minor." *Ante* at ___. But the broadcasts are unclear as to whether that patient was the same as the one with whom Toledo engaged in sexual contact. And as the court of appeals noted, even if they clearly referred to just one patient, an ordinary viewer could conclude that the "financial relationship" was something as simple as exchanging gifts, which is a commonly known tactic of adults who sexually abuse minors. 434 S.W.3d at 285. And in fact, the "financial relationship" that the Board referred to *was* that Toledo "accepted gifts from [the patient] during the time she was treating him."

For these reasons, I disagree with the Court's conclusion that other statements in the broadcasts necessarily altered the gist that the opening statement created and thereby created a

14

different, non-defamatory gist. But more importantly, I disagree with the Court's approach, decreeing that an ordinary viewer could only view the broadcasts the way the Court views them after conducting a careful, line-by-line review of the broadcasts' statements. The Court expressly rejected this kind of "hair-splitting" approach in *Turner*. 38 S.W.3d at 119 (citing *Forsher v. Bugliosi*, 608 P.2d 716, 722 (Cal. 1980) ("[C]ourts must refrain from a 'hair[-]splitting analysis' of what is said . . . to find an innocent meaning . . . .")). Perhaps a particularly attentive, careful, or thoughtful viewer might have considered all that the Court has considered and concluded that Toledo's "patient" must have been an adult, but what a "careful listener" or "careful viewer" would have thought is irrelevant to our analysis. *See id.* (finding that broadcast conveyed a false and defamatory meaning based on what an "ordinary viewer" could believe, even though a "careful listener" might understand a different meaning); *see also Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 948 (5th Cir. 1983) (applying Texas law to reject a "literal reader" standard and instead decide the case based on what "an ordinary reader could infer from the article").

Based on the proper ordinary-viewer standard, I conclude that the broadcasts themselves constitute some prima facie evidence that an ordinary viewer could have concluded that the Board punished Toledo for engaging in sexual contact with a pediatric patient. But in addition to the broadcasts' language, other evidence also supports Toledo's prima facie case. First, a juror could find it persuasive that the Board's press release never mentioned that Toledo was a pediatrician, and KBMT chose to add that fact—as the broadcasts' opening statement—only after finding that fact elsewhere (such as by reviewing Toledo's physician profile on the Board's website). The

15

Board's decision not to refer to Toledo as a pediatrician in the press release is at least some evidence that even the Board believed that referring to Toledo as a pediatrician could indicate that the patient was a pediatric patient.

Second, the evidence that KBMT revised its fourth broadcast to clarify that Toledo was punished for engaging in sexual contact with "an *adult* patient" is some evidence that even KBMT believed that an ordinary viewer could have concluded that the first three broadcasts referred to a pediatric patient. In fact, KBMT has taken the position in this case that its employees did not know that the patient was an adult until after the first three broadcasts. Evidence that KBMT itself believed the patient was a pediatric patient is some evidence that an ordinary viewer could have understood the broadcasts to communicate that belief. *See Turner*, 38 S.W.3d at 119 (relying on evidence that the broadcaster's "employees themselves did not make [the] distinction"). The Court ironically concludes that no ordinary viewer could have understood the broadcasts to assert what KBMT itself believed the broadcasts were asserting.

Third, and most importantly, Toledo testified by affidavit that "immediately" after the broadcasts aired she and her staff received several inquiries that made it "apparent" that some viewers had understood the broadcasts to say that Toledo had engaged in sexual conduct with a pediatric patient, and that some "patients were concerned." This testimony is some evidence that some viewers in fact did understand the broadcasts in the very way the Court concludes no ordinary or average viewer could have understood them. *Ante* at ___. Apparently, the Court believes that these viewers are not ordinary viewers because they did not understand the broadcasts to say what the Court, upon careful review, now understands them to say. This Court specifically rejected that

16

approach in *Turner*. *See* 38 S.W.3d at 117 (applying "the deferential 'no evidence' standard of review").[5]

As a result, the Court usurps the jury's long-established role in defamation suits and deprives Toledo of a trial when the TCPA does not. In light of the broadcasts' opening reference to a "pediatrician" and her "patient," and in light of Toledo's evidence that the ordinary viewers and KBMT itself in fact understood the broadcasts to refer to a pediatric patient, ordinary viewers who actually watched the broadcasts could have reached either conclusion. When, as here, reasonable minds could differ, the question is a question of fact for the jury, rather than a question of law for the courts. *Turner*, 38 S.W.3d at 117 (citing *Musser*, 723 S.W.2d at 654–55 (stating that "when the court determines the language is ambiguous or of doubtful import," the jury should "determine the statement's meaning and the effect the statement's publication has on an ordinary reader")). As the Court explained long ago,

> In the absence of doubt or ambiguity growing out of the language used in the

---

[5] The Court's passing effort to dismiss Toledo's affidavit as "self-serving" and "conclusory hearsay," *see ante* at ___, merely demonstrates how far it is willing to reach to obtain the outcome it desires in this case. "The mere fact that [an] affidavit is self-serving does not necessarily make the evidence an improper basis for summary judgment," *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997), and thus does not necessarily make it non-probative for purposes of establishing a prima facie case. And "conclusory" testimony is testimony (usually, at least, in the form of opinion testimony) that offers nothing more than a "bare conclusion" that is "factually unsubstantiated." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 231–32 (Tex. 2004); *see id.* at 232 ("Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more . . . or less probable.'" (quoting TEX. R. EVID. 401(a))); *see also Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 839 (Tex. 2010) (noting that expert's "opinion lacks factual substantiation and is therefore conclusory"). While a bare assertion that "patients were concerned that I had engaged in sexual contact with pediatric patients" might be conclusory, Toledo's affidavit swearing to the fact that people contacted her office and other physicians making statements and asking questions that made it "apparent" that they had reached that understanding provided not just a conclusion but specific facts that substantiate the conclusion. And as for the Court's hearsay objection, KBMT never raised that (or any other) objection to Toledo's affidavit in the trial court and never challenged its probative value in any court, including this one. Even if the affidavit were all merely inadmissible hearsay, "[i]nadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay." TEX. R. EVID. 802.

publication, we understood it to be the duty of the court to determine and instruct the jury whether or not it is libelous; but, where there is uncertainty or doubt, it is the duty of the court to give the jury a definition of what is a libel, and leave it for the jury to say whether the offense has been proved.

*Cotulla v. Kerr*, 11 S.W. 1058, 1059 (Tex. 1889); *see also Golden Bear*, 708 F.2d at 948 ("If a defamatory meaning may exist, then the statement or article is considered ambiguous, and the court must allow the jury to determine whether an ordinary reader would perceive the statement as defamatory.").

Toledo submitted the required "minimum quantum of evidence" to establish that an ordinary viewer could have understood KBMT's broadcasts to communicate that the Board punished Toledo for engaging in sexual contact with a pediatric patient. *Lipsky*, 460 S.W.3d at 590 (quoting *In re E.I. DuPont de Nemours*, 136 S.W.3d at 223). Because Toledo did not in fact engage in sexual contact with a pediatric patient and the Board did not punish her for such conduct, the broadcasts' gist was substantially more harmful to Toledo's reputation than an accurate broadcast would have been. Toledo thus met her burden to establish a prima facie case that the broadcasts' gist was false, and the trial court correctly denied KBMT's motion to dismiss under the TCPA.

## IV.
## The Truth

The Court's explicit legal holdings in this case relate not to the evidence of the broadcasts' gist but to the "truth" against which the gist must be compared to determine whether the broadcasts were false. Specifically, the Court introduces its opinion by announcing its holding that "the truth of a media report of official proceedings of public concern must be measured against the

18

proceedings themselves, not against information outside the proceedings." *Ante* at ___.[6] For purposes of today's decision, I neither agree nor disagree with this holding. I do agree with the Court that, when the official-proceedings privilege applies, the defendant "may report on the proceedings themselves without independently investigating the matters involved." *Ante* at ___. As the Court notes, the official-proceedings privilege reflects the Legislature's conclusion that requiring certain defendants to "independently investigate the facts before reporting on official proceedings would ill serve the public's interest in government activities." *Ante* at ___. But the question of whether the privilege deems the "truth" to be the official proceedings, rather than the actual underlying facts, presents a complex issue that the Court need not, and thus should not, decide today.[7]

The issue that the Court's holding addresses arises most often when a plaintiff sues a media defendant for defamation and the media defendant contends that it merely accurately reported what some third party said. *See, e.g.*, *Neely*, 418 S.W.3d at 62–65. Under the general rule of defamation, the defendant is liable anyway, because "it is a well-settled legal principle that one is liable for republishing the defamatory statement of another." *Id.* at 61. So if the third party said something

---

[6] *See also ante* at ___ ("[W]e hold that a private individual who sues a media defendant for defamation over a report on official proceedings of public concern has the burden of proving that the gist of the report was not substantially true—*that is*, that it was not a fair, true, and impartial account of the proceedings. That burden is not met with proof that the report was not a substantially true account of the actual facts outside the proceedings." (emphasis added)).

[7] All teasing aside, in light of the Court's matter-of-law conclusion that the broadcasts' gist accurately depicted both the official proceedings and the actual underlying facts, "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." *VanDevender v. Woods*, 222 S.W.3d 430, 433 (Tex. 2007) (quoting *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (ROBERTS, J., concurring)).

defamatory and false about the plaintiff, the media defendant would be liable for repeating the statement, even if it accurately reported what the third party said. Courts and legislatures, however, have recognized various privileges, including the official-proceedings privilege to which the Court refers today, to "soften [the] impact" of this legal principle. *Id.*; *see also id.* at 65 (addressing the "judicial/official" proceedings privileges and declining to decide whether to adopt a "third-party allegation rule," under which "the gist of some broadcasts may merely be allegation reporting, such that one measure for the truth of the broadcast could be whether it accurately relayed the allegations of a third party").

These issues arise, however, only if the defendant's report falsely represents the actual underlying facts. If, for example, a broadcaster reports that the Board found that a physician engaged in improper sexual conduct with a child, and the Board in fact did make that finding, but in reality the physician engaged only in improper sexual contact with an adult, it might matter whether the broadcaster's liability should be determined by comparing the broadcast to the Board's announcement or to the actual underlying facts. Here, however, the Court concludes as a matter of law that KBMT's broadcasts accurately represented the actual underlying facts (that is, that Toledo engaged in improper sexual conduct with an adult, and not with a child). If the Court's matter-of-law conclusion regarding the broadcasts' gist is correct, the question of whether the gist should be measured against the Board's proceedings or against the actual facts is irrelevant because the Court also concludes that the broadcasts were merely "a simple, accurate, fair, brief restatement" of the

20

Board's proceedings. *Ante* at ___.[8] Because the Court believes the broadcasts accurately described both the Board's proceedings and the actual underlying facts, the Court's holding is irrelevant and constitutes judicial dictum at best. *See Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 773 (Tex. 1964) (describing judicial dictum as a holding "deliberately made for the purpose of being followed by the trial court").

I raise this point because the Court's holding represents a legal issue that is far more complicated than the Court's brief analysis suggests. For example, the Court holds that when the official-proceedings privilege applies, "the gist of an allegedly defamatory broadcast must be

---

[8] After explaining why, as a matter of law, the broadcasts' gist was not that Toledo "had sexual contact with a child," the Court attempts to shore up its conclusion with its "[m]ost important[]" point—that, "if there could have been any confusion over the broadcast, the same possibility of confusion existed in the Board's report of its proceedings." *Ante* at ___. Thus, despite its matter-of-law conclusion that "KBMT's broadcast was a simple, accurate, fair, brief restatement of the Board's press release and the order to which Toledo had agreed," the Court falls back on the argument that if the broadcasts were false, the official proceedings were just as false. *Ante* at ___. But as the Court acknowledges, the official proceedings included significant information that KBMT failed to include in its broadcast. Specifically, the agreed order included additional facts that indicated that JC was an adult, including:

- "while engaged in an intimate relationship with JC [, Toledo] injected JC with testosterone and human growth hormone without prescriptions and documentation in a medical record";

- "[Toledo] entered into a relationship with JC, who was not her patient at the time, and who was being prescribed testosterone to self-administer by another physician;"

- "JC related that his diagnosis was an autoimmune disease, for which testosterone is nontherapeutic;"

- "[Toledo] used her medical license to obtain testosterone and human growth hormone for JC while she was in an intimate relationship with him, and administered these substances to him;" and

- "[Toledo] accepted gifts from JC during the time she was treating him."

Apparently, the Court does not believe that these facts, which KBMT omitted from its broadcasts, indicate that JC was an adult. I disagree. But even if, as the Court suggests, the agreed order was equally as confusing as the broadcasts, that would not make it any less likely that an ordinary viewer could have understood the broadcasts to communicate a false meaning. If the broadcasts' "language is ambiguous or of doubtful import," it is a jury's role, and not a court's, to "determine the statement's meaning and the effect the statement's publication has on an ordinary reader." *Musser*, 723 S.W.2d at 655.

21

compared to a truthful report of the official proceedings, not to the actual facts." *Ante* at ___. But whether the official-proceedings privilege applies in this case is a complicated issue in itself. The official-proceedings privilege protects a publication that is a "fair, true, and impartial account" of "an official proceeding . . . to administer the law," unless the defendant "republished" the account "with actual malice after it had ceased to be of public concern." TEX. CIV. PRAC. & REM. CODE § 73.002(a), (b)(1)(B). But as the Court itself notes, the official-proceedings privilege is a statutory privilege, and the statute expressly states that it applies to a "publication by a newspaper or other periodical," and says nothing about statements aired by a broadcaster. *Id.* § 73.002(a); *see ante* at ___ & n.19.

In a short footnote, the Court discounts this point by asserting that broadcasters were not "in existence" when the Legislature enacted that provision in 1901 and claims we extended the privilege to broadcasters in *Neely*. *Ante* at n.19 (citing *Neely*, 418 S.W. 3d at 69). We announced no such express holding in *Neely*; instead, we referred to the judicial- and official-proceedings privileges together in our analysis because any distinction between the two made no difference in that case. *Neely*, 418 S.W. 3d at 69. Here it does, because the broadcasts did not report on any judicial proceedings.

So the Court suggests in passing that we should extend the statutory official-proceedings privilege to broadcasters because section 73.002 does not "exclude other media publications." *Ante* at n.19. Since 1901, however, the Legislature has expressly granted specific protections to "broadcasters" without amending section 73.002. *See* TEX. CIV. PRAC. & REM. CODE § 73.004(a) (providing limited protection for a "broadcaster" for "a defamatory statement published or uttered

22

in or as a part of a radio or television broadcast by one other than the broadcaster"); *id.*, § 73.005(a), (b) (providing truth as a defense in "an action brought against a newspaper or other periodical *or broadcaster*" (emphasis added)). Although I need not and do not decide in this case whether section 73.002 provides the official-proceedings privilege to broadcasters, it is at least difficult to align the Court's abrupt, footnoted conclusion that it does with the respect and deference the Court traditionally gives—and is in fact obligated to give—to statutory text. *See, e.g.*, *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014) ("We presume the Legislature chose statutory language deliberately and purposefully."); *PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004) ("When the Legislature includes a right or remedy in one part of a code but omits it in another, that may be precisely what the Legislature intended," and "we must honor that difference.").

As a second example of how the Court's holding addresses an extremely complicated issue, the Court holds that the official-proceedings privilege requires that "*the truth* of a media report of official proceedings must be measured against the proceedings themselves, not against information outside the proceedings." *Ante* at ___ (emphasis added). As a result, under the Court's holding, the official-proceedings privilege is not just a defense that protects a defendant whose statement falsely recites the actual underlying facts; instead, it actually renders the otherwise false statement "true" if it fairly and accurately describes the official proceedings. *Ante* at ___ (holding that "a private individual who sues a media defendant for defamation over a report on official proceedings of public concern has the burden of proving that the gist of the report was not *substantially true— that is*, that it was not a fair, true, and impartial account of the proceedings. That burden is not met

23

with proof that the report was not a substantially true account of the actual facts outside the proceedings." (emphasis added)). The Court thus resolves the issue we declined to reach in *Neely*: whether "one measure for the truth of the broadcast could be whether it accurately relayed the allegations of a third party." 418 S.W.3d at 65. In my view, it does so too brusquely, paying little mind to the parties' arguments or the TCPA's language.

The official-proceedings privilege is a *privilege*, and a privilege "is an affirmative defense in the nature of confession and avoidance; and, except where the plaintiff's petition shows on its face that the alleged libelous publication is protected by a privilege, the defendant has the burden of proving that the publication is privileged." *Denton Publ'g Co. v. Boyd*, 460 S.W.2d 881, 884 (Tex. 1970). As noted, substantial truth is also an affirmative defense on which the defendant bears the burden, *Neely*, 418 S.W.3d at 56, unless "a private figure sues a media defendant over defamatory statements that are of public concern," in which case "the plaintiff has the burden of proving falsity." *Id.* at 66 n.21. If the official-proceedings privilege determines the "truth" of the defamatory statement, then does the burden also shift to the plaintiff in a suit involving a matter of public concern, so that the plaintiff must prove that the broadcast was not a "fair, true, and impartial" account of the official proceeding?

The Court says yes, holding that while "the defendant must still prove *the applicability* of the privilege—that is, that it is part of the media and that the statements complained of were an account of official proceedings of public concern—the plaintiff must prove that they were false." *Ante* at ___ (emphasis added). Perhaps that is the right answer in light of the Court's constitutional concerns (which no party raised in this case), but the statute expressly provides that the privilege

24

"applies" only if the report is "fair, true, and impartial." TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1). If the privilege "applies" only if the report is fair, true, and impartial, *id.*, and if "the defendant must still prove the *applicability* of the privilege," *ante* at ___ (emphasis added), the statute requires the defendant to prove that the statement was fair, true, and impartial, and does not require the plaintiff to prove that it was not.

Additional statutes also complicate this analysis. In 2013, for example, while this case was pending on appeal, the Legislature amended TCPA section 27.005 to add subsection (d), which provides that, even if a claimant establishes a prima facie case for each essential element of the claim, "the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." TEX. CIV. PRAC. & REM. CODE § 27.005(d); *see* Acts of May 24, 2013, 83rd Leg., R.S., ch. 1042, § 2, 2013 Tex. Gen. Laws 2499, 2499. Since the official-proceedings privilege is a defense, this new provision would at least appear to require that the defendant bear the burden of proving that the broadcast was a fair, true, and impartial account of the official proceedings, but only after the plaintiff provides prima facie proof that the statement was defamatory and actually false.

Similarly, just last year the Legislature amended the statute to provide a "third-party allegation defense," and expressly provided that, in an "action brought against a newspaper or other periodical or broadcaster," the "truth" defense "applies to an accurate reporting of allegations made by a third party regarding a matter of public concern." TEX. CIV. PRAC. & REM. CODE

25

§ 73.005(a), (b).[9] Yet the Legislature made no similar provision for the official-proceedings privilege. So under the statute, does the "truth" defense (for which the burden shifts to the claimant in certain cases) apply to the new third-party-allegation defense but not to the old official-proceedings privilege?

As these examples illustrate, the Court's holding that the official-proceeding privilege determines the "truth" of a defamatory statement implicates statutory and constitutional issues that are far more complex than the Court's brief discussion suggests. But beyond those legal complexities, there remains the practical concern that, by equating the truth of a statement with the privilege to make it, the Court's holding could effectively render the privilege meaningless. If we measure the truthfulness of a statement by whether it accurately describes official proceedings, regardless of the actual underlying facts, the privilege will never be implicated or necessary because the plaintiff's claim would always fail on its merits whenever the elements of the privilege are met. In *Neely*, the Court treated the two as separate, considering whether the underlying allegations were themselves true when determining "substantial truth," and looking to whether the allegations were actually made in the official proceedings to determine whether the broadcasts were privileged. *Neely*, 418 S.W.3d at 67–68.

I need not belabor the point even further. The point is simply that the holding the Court announces today implicates numerous statutory, constitutional, and practical issues that the Court

---

[9] KBMT does not rely on this defense, and cannot rely on it because the Legislature enacted section 73.005(b) in 2015, after our decision in *Neely* and while this appeal was pending. *See* Acts 2015, 84th Leg., R.S., ch. 191, § 1, 2015 Tex. Gen. Laws 1260, 1260. Because this new defense affects the parties' substantive rights, we cannot apply it retroactively to this case. *See* TEX. GOV'T CODE § 311.022; *Univ. of Tex. Sw. Med. Ctr. at Dall. v. Arancibia*, 324 S.W.3d 544, 547–48 (Tex. 2010).

does not address, and yet the holding is irrelevant to the outcome of this case in light of the Court's matter-of-law conclusion that the gist of KBMT's broadcasts accurately described *both* the Board's proceedings *and* the actual underlying facts.

As discussed, I disagree with the Court's conclusion regarding the gist of the broadcasts, but even if the Court agreed with my view on the gist, the Court's holding on "truth" would still be irrelevant. If, as I conclude, Toledo's evidence established a prima facie case that an ordinary viewer could have understood the broadcasts to communicate that the Board disciplined Toledo for engaging in sexual conduct with a pediatric patient, it would still be irrelevant whether we compare that gist to the actual facts or to the official proceedings, unless the Board proceedings communicated that she had engaged in sexual conduct with a pediatric patient. But as the Court concludes, and I agree, the Board's press release and agreed order did not communicate that Toledo engaged in sexual contact with a pediatric patient. *See ante* at ___ (concluding that the broadcasts' gist—that Toledo engaged in sexual contact with an adult—was "a simple, accurate, fair, brief restatement" of the press release and agreed order).[10]

For these reasons, I disagree with the Court's decision to address and decide whether the official-proceedings privilege determines the "truth" of a defamatory statement. Since that issue is irrelevant in light of the Court's matter-of-law holding regarding the broadcasts' gist, the Court should decline to address the issue, just as we declined to address the issue in connection with the

---

[10] Under my view of the broadcasts' gist and the Board proceedings, it would also be irrelevant whether section 73.002 provides the official-proceedings privilege to "broadcasters" like KBMT, because whether it does or not, the gist would be false as to both the official proceedings and the actual underlying facts. I would thus not decide that question either, and the ultimate outcome here would depend on the jury's conclusion regarding the broadcasts' gist.

27

third-party-allegation defense in *Neely*. *See Neely*, 418 S.W.3d at 65 (declining to decide whether to adopt a third-party allegation rule because that rule would not help the media defendant "because there is a genuine issue of material fact as to whether" the broadcast accurately described the third-party allegations).

## V.
## Conclusion

Toledo contends in this case that KBMT's broadcasts falsely described both the Texas Medical Board's proceedings and the actual underlying facts. The Court disagrees, concluding as a matter of law that the broadcasts' gist did not communicate that the Board punished Toledo for engaging in sexual contact with a pediatric patient. Because I conclude that Toledo submitted prima facie proof that an ordinary viewer could have understood the broadcasts to assert the contrary, I disagree with the Court's matter-of-law conclusion regarding the broadcasts' gist. And because the Board's proceedings accurately reflected the actual underlying facts, I disagree with the Court's decision to address whether the official-proceedings privilege determines the "truth" of a defamatory statement, because that holding is irrelevant to the outcome of this case. Because I would affirm the court of appeals' judgment, I respectfully dissent.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 17, 2016

28